LEE, plaintiff in error, *agt.* BENNETT, defendant in error.

*Questions discussed.*

1. Whether the *opinion* of a witness to prove that certain matter published in a newspaper was "*the reports*" of the plaintiff, was competent evidence? The question was this: "From that printed copy, can you state whose reports they were?"

2. Whether the *evidence* relied upon before the justice to *raise a promise* on the part of the defendant below, (Bennett editor and proprietor of the Herald,) to pay the plaintiff, (Lee,) for reporting, was sufficient for that purpose?

This case came before the court upon a writ of error to the supreme court.

The action was originally brought by the plaintiff in error against the defendant in error, before Ambrose Kirtland, Esq., one of the assistant justices of the city of New-York, to recover for alleged services, rendered by the plaintiff as a reporter for a newspaper.

The evidence is taken from the justice's return.

Enoch E. Camp was called as a witness on the part of the plaintiff, who made default, whereupon the plaintiff's attorney moved for an attachment against the said Enoch E. Camp, and made proof of the service of a subpœna on the said Camp, and I refused an attachment, stating, I did not consider that any authority was given me to issue compulsory process to compel the attendance of a witness, but I did grant an order for the said witness to appear before me and show cause why a fine should not be imposed on him for his non-attendance as such witness. The plaintiff not requesting an adjournment on account of the absence of the said witness, the said parties proceeded to the trial of the cause.

John S. Doyle was called, and sworn as a witness on the part of the plaintiff, and was then examined by the attorney for the defendant as to his interest, and testified that he was not interested in the event of this suit.

On his direct examination he then testified, I am not now in the defendant's employ, I was in the month of January last as reporter. I was absent from this city in the month of January

last, by the directions of Bennett specially given. I was absent I know 18 days, and I think 20 days—not less than 18. I saw the New-York Herald during my absence, and I am acquainted with the style of writing of the plaintiff. I saw the plaintiff once in the establishment of the defendant, at which time he handed me the result of a trial: it was a verdict, which trial I do not recollect: it was the cause of Leitga or Williams: it was 11 or 12 o'clock at night, perhaps later, plaintiff came into the office and went up stairs with it: he went to the composing room: I think he handed it to me: I recollect his handing in the verdict at the time I left the city. The defendant said nothing about my getting a person in my place. The following question was then put to the witness by the attorney for the plaintiff. Can you state whether it was necessary for the interest of the defendant to employ a person in your place during your absence?

This question was objected to by the attorney for the defendant, and the objection overruled, and the witness answered, it was; he was compelled to do so, to keep up with the other small papers. Can you state whether the plaintiff did reporting during your absence for the defendant, from your own knowledge? Answer, I recollect his once handing in the verdict, at another time going to the circuit at the trial of Leitga, and receiving from Mr. Lee the minutes of the proceedings of that trial for publication in the Herald, and further, that the foreman of the Herald establishment mentioned to me, and the witness was about stating what the foreman stated, when it was objected to by the attorney for the defendant, and the objection sustained. I saw a manuscript in the plaintiff's hand-writing in the defendant's office, during, I think, the progress of these trials in the circuit court, during the month of January: the manuscript was published in the Herald, the next day, during my absence from the city. I saw the Herald almost daily. Did you see the plaintiff's writing in the Herald during your absence? This question was objected to by the defendant's attorney, and the objection overruled. Answer, I read the reports—I did not see the literal writing of the plaintiff, I saw the printed copy. From that printed copy can you state whose

Lee *agt.* Bennett.

reports they were? The answer to this question was objected to, and the objection sustained. I don't know that the manuscripts of reports are destroyed, I never knew any to be destroyed or to be kept; I am acquainted with Mr. Camp; he was a police reporter in January last for the New-York Herald. Mr. Camp employed me to report for the Herald, and paid me for doing his own work; he never reported, to my knowledge, for the civil courts; the price of reporting, at the lowest calculation, is $1 per day. Question by plaintiff's attorney: Did you ever see a bill for reporting by the plaintiff against the defendant? Answer, I did. What did you do with it? Answer, I examined it, wrote the word correct on it, marked it with my initials, and laid it on defendant's desk. I never had a conversation with the defendant about it; he was not present when I certified it; I called upon the plaintiff upon my return to the city for a copy of the reports; I had no authority to call on him for a copy of the reports.

Question by plaintiff's attorney: How did you know it? Answer, I was told it.

Cross-examined, the said witness further testified, When I was absent from the city, I was about Mr. Bennett's business at Staten Island and at Newark. I am not now in Mr. Bennett's employ; I was reporting at Staten Island two murder cases—Polly Bodine, and Newark case, Marshall's trial. There were reporters from every paper in the city; I know it is a fact may be one or two papers that had not reporters; I was absent, and when I returned I got some copy from Mr. Lee; I can't say it was the same copy I saw in the Herald office; from its being published in the Herald the next day, I know it was the same.

Direct examination. Before I became acquainted with the Herald, I reported for Mr. Camp during his (Camp's) temporary absence or illness; he paid me; Mr. Sutton first employed me to make law reports for the Herald; the defendant was in Europe at the time. In Mr. Bennett's absence I was paid by the book-keeper of the Herald; after he returned, he knew I was employed to report, and continued me and increased my

salary. I never knew Mr. Bennett to employ Mr. Camp in any department except as general reporter.

Thomas Towndrow was then sworn as a witness on the part of the plaintiff, and testified as follows :

I am a reporter and slightly acquainted with Mr. Bennett; I have done reporting for the New-York Herald; Dr. Houston employed me; defendant was present when I was paid for it; he ordered the clerk to pay me; I am satisfied that defendant did not know I was employed till I presented the bill; when I called with the bill, Dr. Houston introduced me to Mr. Bennett, and stated I was the person who did reporting; I reported six times; I was paid for reporting three times, and I have not brought in any bill for the rest; I am acquainted with Mr. Lee, he is competent to report for the Herald; he is considered an excellent reporter; the Herald is printed with very fine type; it is customary for principals or editors to employ other reporters, in the absence of their own regular reporters, or to perform extra services; the value of reporting transient work is at a higher rate than permanent; I should think regular work for a month, or two months, worth from one and a half to two dollars a day; in lengthy trials, when the court sits late at night, such as the cases of Williams and Leitga, it is worth from two to three dollars a day.

Cross-examined. I report for the New-York Citizen. I superintend the whole reporting department. They have another reporter for the evening; I am the regular daily reporter; there is not any custom, to my knowledge, about sub-reporters being paid by principal reporters. I only speak as far as I am concerned myself.

Direct examination. What was Dr. Houston's business when you was employed by him? Answer, He was reporter to the Herald.

Charles McLaughlin was then sworn as a witness on the part of the plaintiff, and testified. I am a reporter for the Express. I know the parties to this suit. Mr. Lee is competent to report for the New-York Herald. I never did any reporting for the Herald. I know Mr. Camp; he is a police reporter for the Herald; it is not customary for police reporters to report law reports; it was impossible for one man to report the police

sessions and law reports at the same time during the month of January. I never knew Mr. Camp to report law cases. Our establishment have two regular law reporters; it is worth one dollar and fifty cents, or two dollars a day for law reporting.

No evidence being adduced on the part of the defendant, the testimony closed, and after the attorneys for the respective parties had taken up considerable time in arguing the case, I inquired whether any evidence had been given that the defendant was the editor and proprietor of the New-York Herald, whereupon the attorney for the plaintiff asked the attorney for the defendant to consent to the introduction of a witness for that purpose, but which consent the attorney for the defendant refused to give, and objected to the introduction of any further testimony. The attorney for the plaintiff then offered to introduce a witness for that purpose, but I refused to allow further testimony, stating as a reason, that it would be improper at that stage of the case, and after the witnesses had left court. The said cause was then submitted on the 19th day of March, 1844. I rendered judgment in favor of the defendant, and for his costs.

AMBROSE KIRTLAND,
*Assistant Justice.*

The plaintiff sued out a writ of *certiorari*, and removed this, judgment into the superior court, and after consideration, that court reversed the judgment of the assistant justice.

The defendant then sued out a writ of error and removed the judgment thus reversed into the supreme court, and after mature deliberation, the supreme court reversed the judgment of the superior court, and affirmed the judgment given by the assistant justice.

The plaintiff below then sued out this writ of error to reverse the judgment of the supreme court, and to procure an affirmance of the judgment of the superior court.

The superior court reversed the judgment of the justice upon the ground that the justice had erred in excluding the opinion of the witness Doyle, offered to be given in evidence by the plaintiff, upon the reading by the witness of a printed copy of matter contained in the defendant's newspaper, that the matter

so printed was the composition or "*the reports*" of the plaintiff.

*Thomas Warner, Attorney and*
*John Graham, Counsel* for plaintiff in error.

*First.* The evidence before the justice was sufficient to require him to render a judgment in favor of the plaintiff, *for something.* It showed:

1. That the regular reporter of the Herald was absent. (*Error Book, fol.* 19.)

2. That it was necessary some person should fill his place; and that no person (*at least other than the plaintiff*) was provided by the defendant. (*Error Book,* 20, 21.)

3. That the plaintiff furnished reports for the paper. (*Error Book,* 19, 20, 21.)

4. That they appeared in it. (*Error Book,* 25, 26.)

5. That they could not possibly have escaped the observation of the defendant.

6. That in rendering the services for which he sought to recover, the plaintiff was acting in concert with the acknowledged employees or agents of the defendant, *in the course of his business.*

From these facts, the justice would have been warranted in inferring, *either* a direct employment of the plaintiff by the defendant, *or* the recognition of his employment by persons connected with his (the defendant's) establishment.

*Second.* With reference to the defendant, a request to the plaintiff, or the employment of the plaintiff, may be inferred "*from the beneficial nature of the consideration, and the circumstances of the transaction.*" (*Oatfield* v. *Waring,* 14 *John. R.* 188; 2 *Kent,* 613.)

*Third.* No matter what may have been the powers of Doyle, (the regular reporter of the paper,) as between himself and the defendant; his acts as between the defendant and an innocent third party (*and the plaintiff is such*) would be conclusive upon the defendant.

The principle is well settled, that an agent "*pursuing his power as exhibited to the public,*" binds his principal, no matter

how he may be limited by " private instructions." (2 *Kent's Com.*, 4th ed., 621.)

*Fourth.* The defendant appears to have considered it a right, incident to the situation of reporter to his paper, to employ an assistant, when necessary.

*See the evidence of Thomas Towndrow, Error Book, fol.* 27 to 30, by which it appears that he was so employed by Dr. Houston, a former reporter to the paper, to assist in reporting, and that the fact was not known to the defendant until he presented his bill, and that the defendant ordered it to be paid.

The principle of law on this branch of the case is, " that the prior conduct of the principal affords just ground to infer a continuance of the agency." (2 *Kent's Com.*, 4th ed., 614, 615.)

*Fifth.* The foreman of the Herald establishment seems to have been cognizant of the acts of the plaintiff. He was a general agent, and, as such, his ratification of the plaintiff's acts would conclude the defendant.

It is true there was no evidence as to what the duties of foreman were; but the business of the defendant was apparent, and that, coupled with the etymology of the word would leave little doubt as to the nature and extent of his powers. The law presumes them to be commensurate " with the obvious purposes, and the general usage, scope, and course of the business, for which the agency itself was apparently created." (2 *Kent's Com.*, 4th ed., 620–622, *particularly note C, in page* 621; *Anderson* v. *Coonley*, 21 *Wend. R.* 279; *State Bank* v. *Wilson*, 1 *Dev. R.* 484; *Walker* v. *Skipwith*, 1 *Meigs R.* 502; *Barry* v. *Foyles*, 1 *Peters S. C. R.* 311.)

*Sixth.* The decision of the justice, in excluding evidence as to the declaration of the foreman of the Herald establishment, was erroneous. (*Error Book, fol.* 21, 22.)

1. In the very nature of things, the foreman must have been a general agent, having the powers of such an agent.

2. Although there may have been no proof as to his powers, it was matter of legal presumption, from what facts did appear. *See 5th point, and authorities cited under it.*

3. It was enough for the plaintiff to show that he was foreman, to be entitled to the most liberal inferences as to the ex-

tent of his powers. If the defendant had sought to restrict them, the better proof lay with him. For authorities on this point generally, see fifth point.

*Seventh.* The justice erred in excluding the question put to the witness Doyle, in relation to the plaintiff's reports. (*Error Book, fol.* 23.)

The rule of law, allowing the opinions of witnesses as evidence, is not confined to mere questions of skill or science. In matters respecting *judgment* alone, they are competent. (*McKee* v. *Nelson*, 4 *Cow. R.* 355; *Morse* v. *The State of Connecticut*, 1 *Conn. R.* 9; 2 *Phillips' Ev., Cowen and Hill's ed.,* 759 to 763.)

JOHN GRAHAM, *Counsel for plaintiff in error.*

The following is a copy of the judgment of Chief Justice JONES, which is here introduced, the same being omitted by mistake, in the case:

"This case came up on certiorari, from the 2d ward court. The plaintiff sued the defendant for work and labor done on a newspaper called the Herald, and the case was tried before Justice Kirtland, who gave judgment for the defendant. At the trial a witness was produced, who said he was a reporter, and well acquainted with the plaintiff, and with his style of reporting; and a report being shown to the witness, and he asked if he could say if that was the work of the plaintiff.

"The question was objected to and overruled by the justice. In this decision this court thinks the justice's opinion of very doubtful propriety, as it is very important for the rights of the plaintiff for him to show, that the report in question had been prepared by him, and testimony to show that the reports were the work of the plaintiff would be material. The gist of the question was to show that the plaintiff was the author or reporter of the article, and the internal evidence of his style would be material. Although it may be admitted to have been but of a low degree in evidence, still it was of some value, and ought to have been received. It was said to have been of the same character as a comparison of handwritings, and resembles that kind of proof which is always admitted by the courts,

Lee *agt.* Bennett.

where there is no proof or acknowledgment; but there were other and more serious objections to the judgment rendered by the justice; for, after the testimony had closed, the justice appears to have remarked that it was not in proof that the defendant was the editor and proprietor of the Herald. And when the plaintiff offered to supply that defect, it was rejected.

" Now, if the defendant was not the editor and proprietor, then was the judgment wrong; for it would have been a proper case for a non-suit. Therefore we think that the ends of justice required the witness to have been examined to that point, and that the same should have been done.

" In this, therefore, the justice erred. ·

" It was also in evidence that the regular reporter of the paper had been absent, that the plaintiff had been engaged to report, had been at the office with MSS. And throughout the trial the defendant had been spoken of as the proprietor of the Herald; and one witness had stated that the bill of the plaintiff had been audited and laid on the desk of the defendant for payment. We think this testimony clearly sufficient to have entitled the plaintiff to have recovered something, although perhaps not the whole of his claim.

" This court is therefore of opinion that the justice has erred, and that his judgment ought to be reversed."

*Benjamin Galbraith, Attorney* and
*Edward Sandford, Counsel* for defendant in error.

*First.* Was the opinion competent within the established rules of evidence?

We respectfully submit that it was not. The testimony of witnesses in courts of justice is confined to facts within their knowledge, and all inferences and opinions to be drawn from such facts belong to the jury, and in this instance belonged to the justice himself.

The opinion of the witness offered in this case does not come within any of the exceptions to the rule that witnesses must testify to facts and speak from personal knowledge. The exceptions admitted are in matters of skill and judgment, when men of science and experience are allowed to give their opin-

Lee *agt.* Bennett.

ions in evidence. They are founded upon the supposition that the witnesses possess peculiar knowledge and understanding of the subject upon which they are to testify. Here no fact existed to which the application of the peculiar literary knowledge of Mr. Doyle, if he possessed any, could be made with any degree of legal certainty. It would be an opinion founded upon the merest conjecture.

1. Because, in a correct report of the proceedings of a public trial, there can be no such thing as a peculiar or distinguishing style. All the peculiar merit there can be in the reporter is to give a faithful transcript of the proceedings; over the form, order and language of a correct report he can have no creative power and no substantial control. Two good reporters, writing down for publication the same proceedings, could not vary materially in their narratives.

2. If there could be any such thing as a literary style in reporting, belonging to the reporter, by which his works could be distinguished from the works of all others, in the performance of the same service, it must be the great accuracy with which the sayings and doings are recorded. Those who approached most nearly to the same degree of accuracy, would necessarily very much resemble the more accurate.

All styles of writing are easily imitated. It certainly has not been before attempted in any court of justice, to prove that a printed article is the composition of any man by putting the printed paper in the hands of a witness, and taking his opinion as to its being in the style of the assumed writer. In all the actions for libel in England and in America, it has never been attempted to prove that the defendant was the author of the libel complained of, by an opinion of a witness as to *the style* of the composition.

In all the indictments and trials for treason, and for libel upon the king, which took place in the worst days of English jurisprudence, when the paramount consideration with the judges was, whether there were danger to the government, if illegal evidence were not admitted, it was not suggested by the most daring and profligate, that an opinion of a witness as to *the style* of the accused could be received to prove the authorship.

A reference to the case of Algernon Sidney, and the case of the seven bishops, and a glance at the arguments of the judges in favor of admitting proof of handwriting by comparison, will show that little scruple existed as to the mode of proof to procure conviction, and yet this seems not to have been thought of. In the act of Parliament, reversing the attainder of Sidney, it was declared that a comparison of handwritings is not legal evidence. Such has ever since been the law of England, and has ever since been the law of this state. (*Vide Johnson* v. *Phillips*, 9 *Cow.* 94–112.)

The general doctrine upon which the admission of opinions of witnesses rests, is very clearly set forth in the judgments of the supreme court of this state, in the cases of *Norman* v. *Wells*, 17 *Wend.* 136–161, and *Lincoln* v. *The Saratoga and Schenectady Railroad Co.*, 23 *Wend.* 425.

The principles of these cases will clearly show the inadmissibility of the evidence rejected by the justice, and the legal correctness of his decision.

This was the only point of law raised in the case, and we understand the judgment of the superior court to have been placed upon this ground.

*Second.* If the superior court could or did examine the propriety of the judgment of the justice upon the facts in evidence before him, we submit, that the judgment of the justice was correct, and should not have been reversed.

The law has been settled by this court in *Noyes & Pettengill* v. *Hewitt*, 18 *Wend.* 141, that where, on a trial in a justice's court, there is evidence on both sides, or only slight evidence, in support of the claim, a court of common pleas (and in this case the superior court) is not authorized on *certiorari* to reverse the judgment, although upon the facts of the case they may arrive at a conclusion different from that drawn by the justice where he decides the cause. It is also settled by the same case, that the supreme court is not concluded by the judgment of the court below, in a *certiorari* case, from reversing the judgment of that court, on the assumption that such judgment was rendered on the facts of the case. It was previously the settled doctrine of the supreme court, that a court of common

pleas, on *certiorari*, had no right to reverse the judgment of a justice, because they came to a different conclusion as to the facts from that arrived at by the justice. The decision of the justice, where he decides the cause, stands upon the same principles with the verdict of a jury. To him belongs, in such a case, the determination of the credibility of witnesses, the weight of evidence, and as a general, if not a universal rule, his decision upon such question is final. He knows the witnesses and hears them testify, and if they fail to convince his mind, how can a court that never saw or heard them venture to pronounce him in error in his judgment? *Stryker* v. *Bergen*, 15 *Wend.* 490, is in point. And in *Oakley* v. *Vanhorn*, 21 *Wend.* 305, Mr. Justice COWEN says, the common pleas do not sit to grant a new trial upon the weight of evidence.

Keeping these principles in view, a reference to the evidence upon which the justice decided that the defendant was not to be charged in the action before him upon an implied assumpsit, will show that the proof was of such a slight and inconclusive character, that it might reasonably have failed to convince his judgment, and that the superior court have exercised an authority not entrusted to them by law, in reversing that judgment.

The circumstances relied upon before the justice to raise a promise on the part of defendant below to pay the plaintiff were these :

In January, 1844, Doyle, the reporter of the defendant, was sent by his direction to Staten Island, and was absent about eighteen days. The defendant did not deem it proper to employ any reporter in his absence, and did not do so, nor did he authorize any one else to do so.

The plaintiff was seen by Doyle once in the establishment of the defendant, where he handed Doyle the result of a verdict in a trial. This was eleven or twelve o'clock at night, and plaintiff went up to the composing room, where he handed it to Doyle.

The justice very improperly and illegally admitted the opinion of Doyle, as to the interests of the defendant requiring a reporter in the absence of Doyle ; but as he afterward disre-

Lee *agt.* Bennett.

garded it, we advert to it, to say that no legal inference can arise upon this part of the evidence.

The plaintiff at the circuit court handed Doyle the minutes of proceedings of Leitga's trial for publication, and Doyle saw a manuscript in the handwriting of plaintiff, in the office of the Herald, which was published. Upon this plaintiff made out a bill against defendant and handed it to Doyle, and Doyle marked it " *correct,*" and laid it on defendant's table. Defendant did not recognize it in any manner, nor had he any knowledge of it until it was left. Doyle called on plaintiff for the reports without any authority. It also appeared that Mr. Camp was the city reporter, employed by defendant, and was his general reporter at the time Doyle was sent away by defendant.

The plaintiff then called a witness, Towndrow, to show that defendant had paid him, without any previous knowledge as he supposed, that this witness had done reporting, to prove that in law he was bound to pay any body, and every body, who handed in reports which were printed in his newspaper. Although Mr. Bennett was ignorant of the name of this witness, it is apparent, from his statement, that he was not ignorant of the fact of his having been employed by his agent, Dr. Houston, to do the work for which he directed him to be paid.

It appears that Dr. Houston was also employed by defendant as general reporter.

The plaintiff then proved by M'Laughlin, that, in his opinion, Camp could not report the police, sessions, and law courts, and that the Express had two reporters.

Towndrow proved that the Citizen had but one reporter for all these courts. It had a day reporter, and a night reporter—but he destroys the grounds of opinion specified by M'Laughlin, to show that Camp could not do the work.

The whole case is this. In January, 1844, defendant had as regular reporters, Dr. Houston, Camp, and Doyle, the last of these being Doyle. He sent Doyle to Staten Island, to do reporting there, giving him no other authority and no other business.

At some time when Doyle was not absent, plaintiff came in and handed Doyle the result of a trial, at whose request it does

not appear, but certainly not at the defendant's, as Doyle was there and employed in that business.    At another time, under similar circumstances, Doyle applied to him for, and obtained, some minutes of a trial, and at another time saw some manuscript in the plaintiff's handwriting in defendant's office, which was published : Doyle swears expressly that all his transactions with plaintiff were without any authority from, or knowledge of defendant.

On this case the legal question arises, can one man thus voluntarily, without any request, and without any knowledge of his acts, make himself the creditor of another ?

If he can, the pockets of our citizens are alarmingly exposed to a most extensive application of this new species of implied assumpsit.    Editors and publishers of newspapers, who receive from all hands and all quarters reports and communications, and print them as items of general intelligence or to oblige parties offering them, can never know the nature or extent of their liabilities.    That a manuscript in the handwriting of an assumed creditor was seen in the printing office, and appeared in the paper, should be held to imply a contract to pay for writing it, would introduce a most extreme and dangerous laxity.

That a person employed by the publisher to procure and prepare reports for his paper, should request another person in the same business to hand them to him, without the authority or knowledge of his employer, and should furnish them as his own, and after being paid himself, turn around and convert the volunteer into a creditor, and support his claim by such evidence, is a proposition to which no court of justice can assent.

The case is a small one in its amount, but the principle is important to the defendant in error, and the evidence introduced to charge him with the claim sought to be recovered was wholly of a most unprecedented character.    The idea that the defendant below was bound to pay, because if he did not employ the plaintiff, two gentlemen of the profession of newspaper reporting deliberately expressed their opinion that he ought to have employed *somebody*, was only equalled by that other truly great

Lee *agt.* Bennett.

conception, that because defendant had paid one man, who conjectured that defendant was ignorant of his having rendered service at the time he did it, he was bound to pay all volunteers who chose to intrude themselves into his business or to intermeddle with his affairs.

An examination of each particular circumstance will show its entirely inconclusive character, and leave no doubt upon the mind, that although the justice erred in admitting evidence, he came to the correct legal conclusion upon the proofs, and that if his judgment has been reversed on this ground, the superior court have erred, and the judgment of the justice and of the supreme court should be affirmed.

There was no request, assent or adoption on the part of defendant, no circumstance proved in the case, from which the law could imply either.

That a request, direct or inferential, must be proved, is a proposition too elementary to require any authority. If one accepts or knowingly avails himself of the benefit of services done for him without his authority or request, the law binds him to pay a reasonable compensation for them. But here there was no knowledge whatever, and no acceptance, because the services rendered were those which defendant had employed others to render, and he had no intimation that they had not been performed by them, or that the plaintiff had performed them.

There was a point raised in the return which is destitute of any plausible foundation. The justice excluded what the foreman of the Herald establishment stated to the witness as mere hearsay. He should have been called to have proved any facts within his knowledge. As foreman, it did not appear that he had any authority to act for the defendant in relation to the matters in controversy; and the declarations of an agent are never received except where it is shown that he speaks as a mere instrument of his principal; no authority was proved, and his declarations were properly excluded.

Another point, more frivolous, was raised, upon the refusal of the justice to issue an attachment, when the plaintiff did not ask an adjournment, but voluntarily went on to trial.

Upon the law of the land applicable to this case, we ask

Lee *agt.* Bennett.

that the judgment of the justice and of the supreme court be affirmed.

'BENJAMIN GALBRAITH, *Attorney for defendant in error.*
EDWARD SANDFORD, *of Counsel.*

☞ (6 *Wend.* 268; 4 *Wend.* 249; 2 *Cowen & Hill,* 702–3; 4 *Hill,* 202) goes the farthest. ☜

DECISION.—Judgment affirmed.

For affirmance, JEWETT, Ch. J., BRONSON, GARDINER, RUG-GLES, WRIGHT, GRAY, and JOHNSON, J. J.

For reversal, JONES, J.

The supreme court *held,* (JEWETT, Justice, delivering the opinion,) that assuming that the defendant was the editor and proprietor of the New-York Herald, as the history of the trial showed that both parties did—it did not show any employment of the plaintiff by the defendant to render the services he claimed to have rendered; and that the justice correctly decided the case upon the evidence.

The rule which requires witnesses to testify to facts from knowledge, and not from belief, justified the decision of the justice in excluding the question put to the witness Doyle, to wit: "From that printed copy, can you state whose reports they were?" There are exceptions to this rule. On questions of skill and judgment, men of science and experience are allowed to give their opinion in evidence. (23 *Wend.* 425.) But this does not come within any exceptions to the rule.

In relation to the point that the justice erred in excluding the evidence as to the declarations of the foreman in the defendant's establishment—*held,* that it was necessary that it should have appeared in evidence that he was the agent of the defendant, transacting business for him, and that such declarations were made in relation to that business, and while engaged in it. There being no such evidence, the evidence offered was properly excluded.